[Cite as *In re: A.W.*, 2018-Ohio-2644.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 105845

## IN RE: A.W.
## A Minor Child

## JUDGMENT:
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL 14105159

**BEFORE:** E.T. Gallagher, P.J., Celebrezze, J., and Keough, J.

**RELEASED AND JOURNALIZED:** July 5, 2018

**ATTORNEYS FOR APPELLANT**

Mark Stanton
Cuyahoga County Public Defender

BY:     Frank Cavallo
           Cullen Sweeney
Assistant Public Defender
Courthouse Square, Suite 200
310 Lakeside Avenue
Cleveland, Ohio 44113

**AMICI CURIAE**

Marsha L. Levick
Juvenile Law Center
1315 Walnut Street, 4th Floor
Philadelphia, Pennsylvania 19107

Amanda J. Powell
P.O. Box 281
Columbus, Ohio 43216


**ATTORNEYS FOR APPELLEE, C.C.D.C.F.S.**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY:     Jeffrey M. Maver
           Kristen L. Sobieski
           Eben McNair
Assistant Prosecuting Attorney
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, P.J.:

{¶1} Appellant, A.W., appeals a judgment invoking the adult portion of his serious youth offender ("SYO") sentence. He claims the following five assignments of error:

1. The trial court violated A.W.'s due process rights by invoking his adult sentence for failure to complete court-ordered sex offender treatment at ODYS when such treatment was not ordered at the time of his disposition, when A.W. received no notice at the time of his disposition that the failure to complete sex offender treatment could result in the invocation of his adult sentence, and when it was factually impossible to complete sex offender programming given the short length of A.W.'s ODYS commitment.

2. The trial court lacked the authority to order A.W. to engage in sex offender treatment while in ODYS custody.

3. The trial court erred when it invoked the adult portion of the SYO sentence under R.C. 2152.14(E) upon insufficient evidence of misconduct, invoking it instead upon a failure to complete a court-ordered treatment program that he was never ordered to complete and that was impossible for A.W. to finish.

4. The trial court violated A.W.'s constitutional protections against incriminating himself by considering statements A.W. was compelled to make during his individual and group sex offender treatment when invoking A.W.'s adult sentence.

5. The trial court erred by denying A.W. his fundamental right to due process by failing to provide proper notice of the adult sentence invocation hearing as required by R.C. 2152.14(D).

{¶2} In addition to A.W.'s assigned errors, the Juvenile Law Center was given leave to appear as amicus curiae and filed an amicus brief raising the following two assignments of error:

1. Using compelled statements made during court-ordered treatment to invoke punishment violates the constitutional privilege against self-incrimination.

2. The constitutional harm of using compelled statements is compounded because it invoked A.W.'s adult sentence, unjustly exposing him to the harsh consequences of the adult justice system.

{¶3} We find no merit to the appeal and affirm the trial court's judgment.

## I. Facts and Procedural History

{¶4} In April 2014, the state filed a complaint alleging that A.W. was a delinquent child because he engaged in conduct that constituted two counts of rape in violation of R.C. 2907.02(A)(2) if committed by an adult. The complaint also alleged that A.W. engaged in conduct that would be considered kidnapping and gross sexual imposition if committed by an adult.

{¶5} A.W. failed to appear in court to answer the charges, and a warrant was issued for his arrest. A.W. was eventually arraigned, over a year later, in May 2015. After the arraignment, the state filed a motion asking the juvenile court to relinquish jurisdiction and transfer the case to the general division of the Cuyahoga County Court of Common Pleas for an adult trial. The state argued there was probable cause that A.W. committed the acts alleged in the complaint and that he was not amenable to rehabilitation in any facility designed for the care, supervision, and rehabilitation of delinquent children.

{¶6} The victim, A.A., testified at the probable cause hearing that she did not know A.W. before he contacted her on a text messaging app known as Kik Messenger. In August 2013, A.A. met A.W. at a community festival where A.W. led her into a nearby woods where he vaginally and anally raped her. She was 13 years old, and A.W. was 17 years old at the time of the rapes.

{¶7} A.A.'s mother took A.A. to Hillcrest Hospital where a rape kit was processed. Three months later, the Ohio Bureau of Criminal Investigation discovered that DNA found on A.A.'s clothes matched A.W.'s DNA, which had previously been entered into a national DNA database known as the Combined DNA Index System ("CODIS"). A.A. subsequently identified A.W. as the perpetrator from a photo lineup.

{¶8} On the second day of the probable cause hearing, the parties reached a plea

agreement, and A.W. pleaded guilty to one count of rape, as amended to include an SYO specification. The remaining charges were dismissed. The SYO disposition consists of a "blended sentence" whereby the juvenile court imposes a traditional juvenile disposition and a stayed adult sentence. R.C. 2152.13(D)(2). The blended sentence allows the juvenile court to enforce the adult portion of the sentence at a later time "if the juvenile commits certain acts that indicate that the juvenile disposition has been unsuccessful in rehabilitating him." *State v. D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 2.

{¶9} After accepting A.W.'s admission to the rape charge, the court committed him to the legal custody of the Ohio Department of Youth Service ("ODYS") until his twenty-first birthday. The court also imposed a three-year prison term "if the Serious Youth Offender specification is imposed." At the dispositional hearing, the court advised A.W. that if he complied with all terms of the juvenile portion of his sentence, "the serious youth offender sentence will go away * * * ." (Oct. 12, 2016 tr. 18.) Moreover, the court stated:

> THE COURT: But young man, I want sex offender treatment put in place for ODYS. You have three sex offenses.[1] So does that mean that you're just a predator? Does that mean you're a stupid kid? What is it that makes you continually have sex offenses, and not just teenage stuff. [A.W.], they're serious, serious offenses.
>
> So I don't know the answer to that, but by the time you get back here in 90 days I want you to have a better understanding of what's appropriate and what's not. Do you understand me?
>
> A.W.: Yes.

(Oct. 12, 2016 tr. 18.)

{¶10} Although the court indicated that it wanted A.W. to undergo sex offender treatment, the journal entry providing the disposition did not order sex offender treatment. The

---

[1] A.W. was adjudicated delinquent of sex offenses in two other cases in addition to this case.

journal entry simply states that "the youth herein is committed to the Legal Custody of the Ohio Department of Youth Services * * * for institutionalization in a secure facility."

**{¶11}** Nevertheless, at the review hearing held in January 2017, A.W.'s probation officer, Cynthia Dansby, informed the court that A.W. was participating in all services except sex offender treatment. (Jan. 18, 2017 tr. 4.) Based on Dansby's remarks, the court warned A.W. that if he did not participate in sex offender treatment, he would have to serve the adult portion of his sentence in adult prison. (Jan. 18, 2017 tr. 5.) In a journal entry dated January 20, 2017 (journalized Feb. 13, 2017), the court stated, in relevant part:

> Although the youth was committed for a sex offense, [t]he youth refuses to take responsibility for his actions nor participate in sex offender treatment. The youth shall fully participate in sex offender treatment.

**{¶12}** The court held another review hearing in March 2017 to assess A.W.'s treatment progress. Dr. Jennifer Alpert informed the court that she assessed A.W. when he first entered ODYS in November 2016, and that A.W. denied committing sex offenses at that time. On December 9, 2016, Dr. Alpert invited A.W. to join a group sex offender class, but he refused. Dr. Alpert further stated:

> I explained to him that I just started a group and I would be willing to take him, but he needed to be completely open and honest about his sexual offending in order to, you know, participate meaningfully in the group. He became angry, he disengaged and he left the room.

(Mar. 31, 2017 tr. 4.) In January 2017, A.W. indicated he was willing to participate in sex offender treatment. (Mar. 31, 2017 tr. 5.) However, because there were no available sex offender groups at that time, Dr. Alpert informed A.W. that he would have to wait until April 2017, when the next group class was scheduled to begin the treatment program. (Mar. 31, 2017 tr. 5.) In response to this information, the court asked:

> So how — I don't understand — even though you have a closed group and I understand that, how did we not go to Plan B and figure out how to get him the

required sex offender treatment? It's been two months now where I ordered him to do something. He agreed to do it and we're the ones that are failing him?

(Mar. 31, 2017 tr. 6.) Dr. Alpert explained that "group sex offender treatment is best practice," and that ODYS does not provide individual sex offender treatment programs because individual treatment is not considered best practice. (Mar. 31, 2017 tr. 6.) Bonita Reaves, an ODYS social worker, later explained at the invocation hearing that youths are not added to group classes that are already in progress "because we're always building on what we learned the day before." (May 22, 2017 tr. 21.)

{¶13} Due to the limited amount of time remaining before A.W.'s twenty-first birthday, ODYS agreed to start A.W. in a new sex offender group and to augment his treatment with individual therapy. However, a social worker from ODYS informed the court that sex offender treatment generally takes nine months for completion and that A.W. would not be able to complete his treatment before his twenty-first birthday.

{¶14} Before the hearing adjourned, A.W.'s probation officer advised the court that it was not the fault of ODYS that A.W. did not start his sex offender treatment sooner. Addressing A.W., Officer Dansby stated:

> You could have been well into sex offender offender treatment had you started when you got there. But because you delayed, that's what's bringing us to today. * * *
>
> It's not on Dr. Alpert and your social worker. This was on you because this didn't have to happen. You could have started treatment in November when you got there, but you choose to do what you do and that's what [sic] brought to today.
>
> So I just wanted to put that out there. That this could have been avoided if you did what you need to do.

(Mar. 31, 2017 tr. 13.)

{¶15} At a review hearing held on May 8, 2017, Dr. Alpert informed the court that although A.W. was participating in the sex offender program, he was only "superficially engaged in his

treatment." The court observed that the state was going to file a motion to invoke the adult portion of A.W.'s SYO sentence. (May 8, 2017 tr. 4.) Officer Dansby also indicated on the record that the consensus at ODYS was that A.W. should be bound over to adult prison. (May 8, 2017 tr. 10.) Accordingly, the trial court scheduled the hearing to invoke the adult portion of A.W.'s sentence for May 22, 2017.

{¶16} The state filed a motion to invoke the adult portion of A.W.'s SYO sentence on May 18, 2017, five days before A.W.'s 21st birthday. At the invocation hearing held on May 22, 2017, defense counsel objected to the state's motion and to the witnesses who testified at the hearing, claiming the motion was untimely. The court proceeded with the hearing over A.W.'s objection.

{¶17} Bonita Reaves testified that A.W. was in her group sex offender class. The classes are conducted in two phases. Phase one covers 35 lessons and generally takes four to six months to complete. As of the date of the hearing, A.W. had only completed seven of the 35 classes in the first phase of treatment. (May 22, 2017 tr. 13.)

{¶18} Robin Palmer, president of the Mokita Center,[2] testified that she evaluated A.W. one week before the hearing. Palmer used an assessment tool called the Estimate of Risk of Adolescent Sexual Offense Recidivism ("ERASOR"), which evaluates 25 risk factors correlated to sexual reoffending. A.W.'s score revealed he had 20 of the 25 risk factors, which correlates to a high risk of reoffending. (May 22, 2017 tr. 36.)

{¶19} Palmer further stated that although A.W. eventually participated in sex offender treatment, he was motivated by his SYO status and wanted to avoid the adult portion of his sentence. (May 22, 2017 tr. 37-38.) Palmer explained that when juveniles are motivated by an external threat such as prison, the treatment is generally not meaningful.

---

[2] The Mokita Center is a private business that contracts with the juvenile court to perform assessments, counseling, and monitoring of juveniles charged with sex offenses.

**{¶20}** According to Palmer, A.W. also had antisocial personality disorder with narcissistic tendencies, which is known to be resistant to treatment. Therefore, Palmer concluded that continued therapy would not be effective and that a correctional approach would be more effective because A.W. would be

forced to understand the seriousness of his conduct and the harm it caused his victims.

**{¶21}** Based on the evidence presented at the hearing, the juvenile court concluded that A.W. failed to participate in sex offender treatment in a meaningful way and invoked the adult portion of his sentence. However, the court reduced the adult sentence to two years in adult prison followed by five years of mandatory postrelease control. A.W. now appeals the invocation of the adult portion of his SYO sentence.

## II. Law and Analysis
### A. Due Process

**{¶22}** In the first assignment of error, A.W. argues the trial court violated his right to due process by invoking the adult portion of his sentence in three ways (1) the trial court did not order sex offender treatment at the time of disposition, (2) A.W. had no notice at the time of his disposition that failure to complete sex offender treatment could result in the invocation of his adult sentence, and (3) it was impossible for A.W. to complete sex offender treatment given the limited duration of his commitment to ODYS.

**{¶23}** In the second assignment of error, A.W. argues that because the juvenile court failed to order sex offender treatment in its original dispositional order, it lacked authority to impose court-ordered sex offender treatment at the review hearing held three months later. We discuss these assigned errors together because they are interrelated.

### 1. Authority to Order Sex Offender Treatment

**{¶24}** When a juvenile court commits a child to the legal custody of ODYS, the court's jurisdiction terminates, except over certain decisions regarding judicial release, early release, and supervised release. *See* R.C. 2152.22; *State v. McCallister*, 5th Dist. Stark No. CA-7264, 1987 Ohio App. LEXIS 10009 (Dec. 7, 1987). In other words, the juvenile court loses jurisdiction to impose new orders on a child once the child has been committed to ODYS. R.C. 2152.22(A) acknowledges the separation of powers between the judiciary's role of defining a definite minimum commitment and ODYS's executive power to determine conditions under which the commitment is served. Therefore, the trial court's judgment dated January 20, 2017, ordering A.W. to "fully participate in sex offender treatment" was a nullity because it was entered after A.W. had already been committed to the legal custody of ODYS.

**{¶25}** Nevertheless, the court's failure to include an order requiring A.W. to complete sex offender treatment in the original dispositional judgment entry does not mean that the treatment was not ordered or required at the time A.W. entered ODYS custody. Such orders from the juvenile court are unnecessary to require a child to complete sexual offender treatment because ODYS has broad authority to

[r]eceive custody of all children committed to it under Chapter 2152
of the Revised Code, cause a study to be made of those children, and *issue any orders*, as it considers best suited to the needs of any of those children and the interest of the public, *for the treatment of* each of those children.

R.C. 5139.04.

**{¶26}** ODYS ordered A.W. to participate in sex offender treatment in November 2016, when he came into ODYS custody. At the first review hearing held in January 2017, Dansby reported that A.W. had been ordered to participate in sex offender treatment and he refused to comply with that order. (Jan. 18, 2017 tr. 4.) Therefore, the trial court's failure to expressly

include an order that A.W. complete sex offender treatment in the original dispositional order is of no consequence since ODYS had authority to make the order.

## 2. Notice

{¶27} Still, A.W. argues he had no notice at the time of disposition that failure to participate in sex offender treatment could result in invocation of his adult sentence and that such lack of notice violated his right to due process.

{¶28} The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property without due process of law."   Due process rights are applicable to juveniles through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.   *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 23.

{¶29} The concept of due process escapes concise definition because it is "a flexible concept that varies depending on the importance attached to the interest at stake and the particular circumstances under which the deprivation may occur."   *Aalim* at ¶ 22, citing *Walters v. Natl. Assn. of Radiation Survivors*, 473 U.S. 305, 320, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). As relevant here, the fair warning requirement of the Due Process Clause prohibits an individual from being held "criminally responsible for conduct which he could not reasonably understand to be proscribed."   *Rose v. Locke*, 423 U.S. 48, 50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975).   That is, due process requires that "the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden."   *Id*.

{¶30} A.W. claims he had no notice that failure to complete court-ordered sex offender treatment at ODYS would result in invocation of his adult sentence. However, the trial court specifically told A.W. at the dispositional hearing that it wanted him to receive sex offender treatment.   (Oct. 12, 2016 tr. 18.)   As previously stated, the court advised A.W. as follows:

THE COURT: But young man, I want sex offender treatment put in place for ODYS. You have three sex offenses. So does that mean that you're just a predator? Does that mean you're a stupid kid? What is it that makes you continually have sex offenses, and not just teenage stuff. [A.W.], they're serious, serious offenses.

So I don't know the answer to that, but by the time you get back here in 90 days I want you to have a better understanding of what's appropriate and what's not. Do you understand me?

A.W.: Yes.

(Oct. 12, 2016 tr. 18.)

**{¶31}** Moreover, the court explained:

I'm going to be bring you back in 90 days and see how you're doing. That means are you getting your education, *are doing what you're supposed to, are you participating in group therapies * * * *?*

All of those things will matter when you come back and we have a hearing. And I'm going to bring you in so that I can look at you face-to-face. *And if, in fact, you are not doing what you're supposed to, I am going to cut the sentence at ODYS and send you to prison.*

(Emphasis added.) (Oct. 12, 2016 tr. 17.) Therefore, the court warned A.W. that if he failed to comply with the treatment programs imposed by ODYS, which included sex offender treatment, he would serve the adult portion of his sentence. He was on notice.

### 3. Impossible to Complete

**{¶32}** Finally, A.W. argues his right to due process was violated because the adult portion of his sentence was contingent on his completing sex offender treatment but completion was impossible due to the short duration of his commitment to ODYS. However, the court never conditioned the adult portion of his sentence on completion of the entire sex offender program. At the dispositional hearing, the court explained that it wanted A.W. "to have a better understanding of what's appropriate and what's not." And, as previously stated, the court advised A.W. that it would not invoke A.W.'s adult prison sentence as long as he did "what [he was] supposed to do" and "participat[ed] in group therapies." (Oct. 12, 2016 tr. 17.) At the

January 2017 review hearing, the court reiterated that "the long and short of it is that he's doing well," which simply means making progress. (Jan. 18, 2017 tr. 8.)

{¶33} Having advised A.W. that the court simply expected participation and progress in the required therapies, it is doubtful the court would have invoked the adult portion of A.W.'s sentence just because he failed to complete the entire program if A.W. had taken his sex offender treatment seriously from the time he entered ODYS. In other words, A.W. could have avoided the adult sentence if he had complied with the required therapies when they were offered to him in December 2016.

{¶34} Therefore, the first and second assignments of error are overruled.

## B. Evidence of Misconduct

{¶35} In the third assignment of error, A.W. argues the trial court erred in invoking the adult portion of the SYO sentence where there was insufficient evidence of misconduct. He contends the adult sentence is not supported by legally sufficient evidence because (1) the failure to complete sex offender treatment does not constitute "misconduct" within the meaning of the SYO statute, (2) A.W. fully complied with the trial court's orders to complete as much of the sex offender program as he could, and (3) it is fundamentally unfair to invoke the adult sentence for failing to complete a treatment program that was impossible for him to finish given the length of his disposition.

### 1. Misconduct

{¶36} A.W. first argues there was insufficient evidence of misconduct because failure to complete sex offender treatment does not constitute misconduct under the SYO statute.

{¶37} R.C. 2152.14 of the SYO statute states, in relevant part:

(1) The juvenile court may invoke the adult portion of a person's serious youthful offender dispositional sentence if the juvenile court finds all of the following on the record by clear and convincing evidence:

(a) The person is serving the juvenile portion of a serious youthful offender dispositional sentence.

(b) The person is at least fourteen years of age and has been admitted to a department of youth services facility, or criminal charges are pending against the person.

(c) The person engaged in the conduct or acts charged under division (A), (B), or (C) of this section, and the person's conduct demonstrates that the person is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction.

R.C. 2152.14(E)(1).

{¶38} Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶39} The conduct referred to in R.C. 2152.14(E)(1)(c) includes evidence that "'[t]he person has engaged in conduct that creates a substantial risk to the safety or security of the institution, the community, or the victim.'" *In re D.J.*, 9th Dist. Summit Nos. 28472 and 28473, 2018-Ohio-569, ¶ 8, quoting R.C. 2152.14(A)(2)(b).

{¶40} In *In re D.J.*, the court held that the youth's delay in commencing sex offender treatment coupled with evidence that the sex offender treatment the youth received failed to achieve the desired results constituted sufficient evidence that the youth engaged in conduct that created a substantial risk to the safety and security of the community. *Id.* at ¶ 11. Therefore, failure to actively participate in sex offender treatment constitutes misconduct under R.C. 2152.14(E)(1)(c) if the failure to participate in treatments results in inadequate rehabilitation.

{¶41} It is undisputed that A.W. was serving the juvenile portion of his SYO sentence in the custody of ODYS and that he was over 14 years of age at the time the court invoked the adult portion of his sentence. Thus, the requirements of R.C. 2152.14(E)(1)(a) and (b) were unequivocally satisfied.

**{¶42}** As previously stated, A.W. refused to participate in sex offender treatment, and his refusal caused a substantial delay in the start of the treatment program. Bonita Reaves testified that as a result of the delayed start

to treatment, A.W. only completed seven of 35 sex offender lessons in the first phase of the program. (May 22, 2017 tr. 13.) Robin Palmer testified that she administered the ERASOR assessment to A.W. one week before the hearing and that A.W. possessed 20 of the 25 risk factors for sexual reoffending.

**{¶43}** The delay in starting sex offender treatment significantly reduced the time in which A.W. could receive treatment, and the limited treatment he received was not enough to reduce his likelihood of recidivism. He had only scratched the surface. Because A.W. failed to demonstrate any meaningful progress with the treatment, he continued to pose a substantial risk to the safety of the community. And since A.W. was turning 21 years of age on the day after the hearing, the evidence demonstrated that he was not likely to be rehabilitated during the remaining period of juvenile jurisdiction.

**{¶44}** Therefore, there is clear and convincing evidence in the record supporting the trial court's judgment invoking the adult portion of A.W.'s SYO sentence.

**{¶45}** A.W. nevertheless argues that it is fundamentally unfair to invoke the adult portion of his sentence for failing to complete a treatment program that was impossible for him to finish given the short duration of his disposition. However, as previously stated, the trial court never required that A.W. complete the entire sex offender program. It conditioned the adult portion of the sentence on A.W.'s participation in the sex offender treatment program and effective progress in that treatment. The court indicated it would have been satisfied if A.W. had taken responsibility for his actions and actively engaged in sex offender treatment in a meaningful way. The court stated at the dispositional hearing that it wanted A.W. "to have a better understanding

of what's appropriate and what's not." (Oct. 12, 2016 tr. 18.) A.W. never demonstrated an openness or desire to benefit from sex offender treatment.

**{¶46}** Moreover, A.W. created all of the circumstances that caused his treatment to be curtailed. A.W. failed to appear in court for his arraignment on April 22, 2014, and a warrant was issued for his arrest. Consequently, A.W. was not arraigned until May 2015. Following his arraignment, A.W. was released into the community and again failed to appear in court in September 2015. A second warrant was issued for his arrest.

**{¶47}** Once A.W. admitted the rape and was committed to the legal custody of ODYS, he refused to participate in sex offender treatment even though the court advised him that sex offender treatment would be part of his rehabilitation program and that failure to comply would result in service of the adult sentence. (Oct. 12, 2016 tr. 17.) A.W. had the ability to avoid the adult sentence but he squandered it, which ultimately caused his lack of time to show progress. We find nothing unfair about the imposition of his adult sentence under these circumstances.

**{¶48}** The third assignment of error is overruled.

### C. Self-Incrimination

**{¶49}** In the fourth assignment of error, A.W. argues the trial court violated his Fifth Amendment privilege against self-incrimination when it relied on statements he made to his therapists during sex offender treatment to justify the imposition of the adult portion of his sentence. The amici curiae also argue in their first assigned error that "using compelled statements made during court-ordered treatment to invoke punishment violates the constitutional privilege against self-incrimination." In its second assignment of error, the amicus curiae asserts that the constitutional harm of using compelled statements was compounded because it invoked A.W.'s adult sentence and unjustly exposed him to the harsh consequences of the adult justice system. We discuss these assigned errors together because they are closely related.

{¶50} The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." Article I, Section 10, of the Ohio Constitution contains nearly identical language. Constitutional safeguards such as the Fifth Amendment protection against self-incrimination apply to juvenile delinquency proceedings. *In re D.S.*, 111 Ohio St.3d 361, 2006-Ohio-5851, 856 N.E.2d 921, ¶ 17.

{¶51} In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the state may not use incriminating statements made by a defendant during a custodial interrogation against him in a criminal proceeding unless it proves that procedural safeguards resulted in the defendant's voluntary waiver of his Fifth Amendment rights. These procedural safeguards include informing the defendant, before interrogation, that he has the right to remain silent, the right to speak to an attorney, and the right to have an attorney present during questioning. *Id*.

{¶52} Where a defendant is entitled to these procedural safeguards and the state fails to inform the defendant of his Fifth Amendment rights, the state is precluded from using any incriminating statements made during the custodial interrogation against the defendant. *Id*. at 469. For purposes of the Fifth Amendment privilege against self-incrimination, there is no appreciable difference between the guilt and penalty phases of the criminal proceedings. *Estelle v. Smith*, 451 U.S. 454, 462-463, 101 S.Ct. 1966, 68 L.Ed.2d 359 (1981).

{¶53} Generally, the right to be free from state coerced self-incrimination must be invoked or it is lost. *Roberts v. United States*, 445 U.S. 552, 559, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980). If a person, compelled by the state to make self-incriminating statements, chooses to make the statements rather than invoke the privilege, the person has not been compelled by the government and has offered the statements voluntarily. *State v. Evans*, 144 Ohio App.3d 539,

550, 760 N.E.2d 909 (1st Dist.2001).

{¶54} However, there are situations in which the right to be free from self-incrimination is triggered in the absence of its express invocation. In these situations, the right becomes self-executing, and the defendant is excused from asserting the privilege. *Garner v. United States*, 424 U.S. 648, 654, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976). One such situation, known as the "classic penalty scenario," occurs where the assertion of the privilege against self-incrimination is penalized so as to foreclose the right to remain silent. *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), quoting *Garner* at 661. To constitute a "classic penalty situation," the individual must be faced with the government's assertion, either expressly or impliedly, that invocation of the Fifth Amendment will lead to a substantial penalty. *Lefkowitz v. Cunningham*, 431 U.S. 801, 805-06, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977).

{¶55} In *Evans*, the First District Court of Appeals held that Evans, a juvenile, was in the "classic penalty situation" when he made incriminating statements to his counselors during court-ordered therapy. Evans made the statements while he was involuntarily confined in an ODYS facility. In concluding that the "classic penalty" exception to the *Miranda* procedural safeguards applied, the *Evans* court explained that "[h]ad Evans failed to participate, he could have been found in violation of the court order that he do so, and he would have risked transfer to a far more restrictive facility." *Id*. at 547.

{¶56} It is undisputed that A.W. was involuntarily confined by ODYS and that his participation in the sex offender treatment was compulsory. The juvenile court had previously warned A.W. that if he failed to participate in sex offender treatment, he would have to serve the adult portion of his sentence in prison. (Jan. 18, 2017 tr. 5.) A.W. was in the classic penalty situation because had A.W. asserted his right to remain silent, he would have been

penalized by invocation of the adult portion of his sentence. Therefore, incriminating statements A.W. made to his counselor, such as how he fantasizes about his rapes and intends to watch violent pornography after his release from ODYS even though it is a known trigger for sex offending, were privileged under the Fifth Amendment and could not be used against him to invoke the adult portion of his sentence.

{¶57} The remedy for Fifth Amendment violations is suppression of the tainted evidence. *Missouri v. Siebert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Thus, evidence of A.W.'s incriminating statements could not be used as a basis for invoking his adult sentence. We nevertheless find that the record contains sufficient evidence to support the trial court's decision to invoke A.W.'s adult sentence without A.W.'s incriminating statements.

{¶58} As previously stated, A.W. refused to participate in sex offender treatment when it was ordered in November 2016. (Jan. 18, 2017 tr. 4.) Dr. Alpert informed the court that she invited A.W. to join a sex offender group in December 2016, and he once again refused. (Mar. 31, 2017 tr. 4.) Although A.W. eventually agreed to participate in sex offender treatment in January 2017, there were no groups available at that time. When A.W. finally started treatment in April 2017, only one month remained before his twenty-first birthday. Consequently, A.W. only completed seven of the 35 lessons required from the first phase of sex offender treatment at the time of the invocation hearing . (May 22, 2017 tr. 13.)

{¶59} A.W. argues the trial court must have relied on A.W.'s incriminating statements when it imposed his adult sentence because all the other evidence established that he was a model participant. Indeed, Dr. Greene testified that A.W. "was very engaged and he did do the work." Bonita Reeves testified that A.W. "did well" in the group, "was always on time," "did a lot of sharing," "asked relevant questions," and "completed all of his homework assignments."

{¶60} However, Dr. Alpert informed the court that although A.W. attended classes and

did the work, he was only "superficially engaged." Dr. Palmer stated that A.W. attended sex offender classes and did what he was supposed to do, not because he was interested in reforming his behavior, but because he wanted to avoid prison. (May 22, 2017 tr. 39.) He was "just going through the motions." Moreover, Dr. Palmer explained that due to A.W.'s late start in the sex offender treatment program, he was unable to make any meaningful progress. (May 22, 2017 tr. 39.)

{¶61} In its judgment entry invoking the adult portion of A.W.'s sentence, the court found that A.W. "placed the community at risk since * * * sexual offender treatment was offered upon the youth entering ODYS at Cuyahoga Hills Correctional Institution and the Youth refused treatment and did not engage in [treatment] until April 2017." (Entry journalized May 31, 2017.) Therefore, the trial court's decision to invoke the adult portion of A.W.'s sentence is supported by clear and convincing evidence as required by R.C. 2152.14(E) even without consideration of statements A.W. made to his therapists during sex offender treatment.

{¶62} A.W.'s fourth assignment of error and both of the assigned errors raised in the amicus brief are overruled.

### D. Notice of the Hearing

{¶63} In the fifth assignment of error, A.W. argues the trial court violated his right to due process of law by failing to provide him proper notice of the hearing to invoke the adult portion of his sentence as required by R.C. 2152.14(D).

{¶64} The prosecutor filed the motion to invoke the adult portion of A.W.'s sentence on Thursday, May 18, 2017. The court held the invocation hearing on the following Monday, May 22, 2017. A.W.'s trial counsel objected to the hearing and to the state's witnesses, claiming he had not been served with the state's motion until the day of the hearing. The state asserted that it sent notice to A.W.'s trial counsel electronically, but defense counsel claimed he never

received it. Therefore, A.W. now argues that his right to due process was violated because he was not afforded adequate notice and a reasonable opportunity to prepare a defense to the state's motion to invoke the adult sentence.

{¶65} R.C. 2152.14(D), which governs hearings to determine whether to invoke the adult portion of an SYO, does not provide a time frame within which notice must be provided to the juvenile. A.W. argues that because R.C. 2152.12(G), which governs bindover hearings, requires that counsel receive notice "at least three days prior to the hearing, a three-day notice requirement should apply to invocation hearings under R.C. 2152.14(D). We disagree. If the legislature had intended to legislate this specific notice requirement, it would have expressly included it in R.C. 2152.14(D). We therefore review A.W.'s claim under standard principles of due process.

{¶66} "The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Thus, due process requires that the accused be given "notice and opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

{¶67} A.W. claims he had no notice of the invocation hearing prior to the actual date of the invocation hearing on May 22, 2017. However, the trial court scheduled the invocation hearing on the record at the May 8, 2017 review hearing. (May 8, 2017 tr. 12, 16.) Therefore, A.W. had almost two weeks notice of the invocation hearing.

{¶68} A.W. argues that even though the court scheduled the invocation hearing on May 8, 2017, the court's statements on the record do not constitute adequate notice for due process purposes because he was absent from the courtroom when the court made them. However, his trial counsel was present, represented A.W., and received notice on his behalf. Therefore, A.W. received timely notice of the hearing through his trial counsel.

**{¶69}** Furthermore, there was only one reason for the invocation hearing; A.W. had not engaged in sex offender treatment in a meaningful way that could result in any amount of rehabilitation. The record shows that the court scheduled the hearing because A.W. was only "superficially engaged" in sex offender treatment and had not made sufficient progress with it. (See generally May 8, 2017 transcript.) ODYS personnel repeatedly informed the court that A.W. complied with all required treatments except sex offender treatment. Therefore, A.W. not only had timely notice of the invocation hearing, he was on notice that his deficient progress in sex offender treatment was the proposed

basis for invoking the adult portion of his SYO sentence. We find no due process violation under these circumstances.

**{¶70}** Therefore, the fifth assignment of error is overruled.

**{¶71}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., CONCURS;
KATHLEEN ANN KEOUGH, J., DISSENTS WITH SEPARATE OPINION

KATHLEEN ANN KEOUGH, J., DISSENTING:

**{¶72}** This case represents how our juvenile justice system has failed our juveniles. Much emphasis has been placed on A.W.'s failures, which I am not discounting. However, when a system that is put in place to protect our most vulnerable while protecting our community fails, we cannot put the entire blame on A.W. to justify the invocation of the adult portion of his sentence. The system in this case sabotaged any effort that A.W. made or could have made to prevent the adult portion of his sentence to be invoked. The dangling carrot was never going to be caught.

**A. The system failed the community by failing to execute the initial arrest warrant, yet blamed A.W. for going "AWOL" on two occasions.**

**{¶73}** On April 22, 2014, the state filed a complaint against A.W., then age 17, for sex offenses committed in 2013. On that same day, the state requested that an arrest warrant for A.W. be issued, and the juvenile court conducted a hearing. The court subsequently issued a journal entry stating that the matter came for a hearing on April 22, 2014, and "notwithstanding receipt of notice, the youth has failed to appear." Accordingly, the juvenile court issued an arrest warrant for A.W. that day. The record is completely silent on how, if, or when A.W. received notice that a complaint was filed against him, that the state requested a warrant be issued, and that the court was hearing the matter, which all occurred on April 22, 2014. Yet the juvenile court and A.W.'s parole officer at ODYS blamed him for going "AWOL" during that time. The record is also silent as to what attempts were made to apprehend A.W. during this time until his arrest on May 26, 2015, over a year later, when A.W. was 18 years old.

**{¶74}** On May 26, 2015, when A.W. appeared in juvenile court for another matter, he was arrested and arraigned for this case. Admittedly, A.W. failed to appear for a pretrial on September 10, 2015, and a warrant was issued for his arrest. Despite his flight, the record is

again silent as to what attempts were made to apprehend A.W. during this time. When A.W. was finally apprehended on May 8, 2016, he was age 19.

**{¶75}** I point this out for two reasons. First, A.W. did not go "AWOL" on two occasions. So any delay in his adjudication from the time of the complaint until his arrest in May 2015 should not be attributed to him. And secondly, the state made an issue of A.W.'s criminal history and the danger he posed to the community, yet failed to show what steps it took to secure his appearance other than simply having an arrest warrant issued.

**B. The system failed A.W. in the delay of prosecution.**

**{¶76}** Once A.W. was apprehended, the probable cause hearing was originally scheduled for June 28, 2016, but was continued due to an unavailable state's witness. The probable cause hearing, which turned into an adjudication hearing, finally occurred on September 7 and 13, 2016. A.W. was now 20 years old. At this time, the state and the juvenile court knew that any mandatory programs or treatment in ODYS would be for less than eight months before A.W.'s 21st birthday, yet they believed A.W. could be rehabilitated in the juvenile justice system.

**C. The system failed A.W. by giving him false hope during adjudication**

**{¶77}** At the time of adjudication, prior to A.W. making his admission to the amended complaint, the court made the following statements on the record:

> So he will stay in Juvenile Court. And the *only way* you will go to Adult Court, young man, is *if you act out so badly at ODYS* that they cannot handle you. Meaning, that you continually fight, you continually create delinquent acts. Once you are 21 years of age, this Court loses jurisdiction and the SYO, what we call the serious youth offender specification, goes away. Does that make sense?

(September 13, 2016 tr. 79.). Following this advisement, the court engaged in a conversation with A.W., his mother, and defense counsel explaining the types of behavior that would warrant the imposition of the adult portion of his sentence — "I don't mean just get into random fights. I mean he literally refuses to follow any of the rules and is constantly [a problem]. * * * And I

mean serious.  * * *  So it has to be fairly severe."  (*Id*. at tr. 79-80).   The court continued explaining that if he engaged in these types of behaviors, A.W. would come back before the court and following a hearing, the court would determine whether "he in fact is an aggressor and I need to invoke the serious youth offender."   (*Id*. at tr. 81.) Defense counsel also read on the record the language in R.C. 2152.14(B) that governs under what circumstances the SYO dispositional sentence will be invoked.

{¶78} Thereafter, the juvenile court engaged in the requisite plea colloquy with A.W. and he admitted to the charges in the delinquency complaint.   During the plea colloquy, the juvenile court vaguely advised A.W. that "if in fact you don't do what you're supposed to do in ODYS, that they can impose the sentence and you can be sentenced from anywhere between 3 to 11 years * * *."   However, at no time during his plea, did the court explain to A.W. that the adult portion of his sentence would be invoked for failing to comply with counseling, treatment, or any other programs ODYS ordered.

## D.   The system failed A.W. by depriving him of due process

{¶79} In addition to protection against the deprivation of "life, liberty, or property without due process of law," juveniles, at a minimum, "are entitled to proceedings that 'measure up to the essentials of due process and fair treatment.'"   *In re J.V.* 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 14, quoting *Kent v. United States*, 383 U.S. 541, 562, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).   The fair warning or notice requirement of the Due Process Clause prohibits an individual from being held "'criminally responsible for conduct which he could not reasonably understand to be proscribed.'"   *Rose*, 423 U.S. at 49, quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct.808, 98 L.Ed. 989 (1954).   Although the nature of the due process clause defies a rigid application in juvenile cases, the Ohio Supreme Court has held that "'fundamental

fairness is the overarching concern.'" *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 71, quoting *D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, at ¶ 51.

### 1. No Order for Sex Offender Treatment

{¶80} As the majority correctly points out, the juvenile court did not specifically order sex offender treatment in its dispositional judgment entry, and any attempt to "correct" that order was a nullity. Additionally, I agree that R.C. 5139.04 allows ODYS to "issue any orders" for the treatment of the children. However, the evidence in the record is insufficient to conclude that ODYS "ordered" A.W. to participate in sex offender treatment. Contrary to the majority's assertion, at no time during the first review hearing on January 18, 2017, did Officer Dansby testify that A.W. was *ordered* to participate in sex offender treatment. She stated:

> [A.W.] continues to deny the accusations. He does not participate in any type of treatment. And according to [the] latest report they have given him until January 31st to weigh his options as to whether he'll participate in treatment or not, but as of this date he's not participating.

(January 18, 2017 tr. 4.) Morever, Dr. Alpert later testified at a subsequent hearing, that she *invited* A.W. to attend her group session in December, which A.W. declined. Accordingly, I cannot say that A.W. was ordered to attend sex offender treatment.

{¶81} Furthermore, I find it reasonable to believe that if ODYS felt that it could order A.W. to engage in sex offender treatment, then there was no necessity for ODYS to confirm with the juvenile court whether treatment "was ordered in the journal entry."

> THE COURT: Okay. All right. So I guess you can take him back. Do you need me to order anything specific, Officer Dansby?
>
> MS. DANSBY: No.
>
> THE COURT: Can you remind him of this conversation when he says, I'm not doing anything?
>
> MS. DANSBY: Yeah, I mean, it's in the journal entry, right, that he has to have sex offender treatment?

THE COURT: Yes.

MS. DANSBY: Okay.   That's all they need.

(January 18, 2017 tr. 10-11.)

**{¶82}** Although it is true that the juvenile court "wanted" A.W. to receive sex offender treatment, no order was issued requiring that he participate or complete treatment.   When dealing with individuals in the juvenile justice system, I am mindful that unless they are specifically ordered to do a task and advised of the consequences, it is likely that they will not engage in that activity willingly or voluntarily.   This is evidenced by A.W.'s understanding at the January 18, 2017 review hearing, when the juvenile court for the first time advised A.W. that he must participate in sex offender treatment or the adult portion of his sentence would be imposed.   A.W. unequivocally stated he understood, and contrary to the majority's position, nothing in the record demonstrates that A.W. refused to participate in such treatment following the court's order.   The juvenile court's ultimatum occurred five months before A.W.'s 21st birthday.

### 2.   No Notice of Consequences

**{¶83}** I also disagree with the majority's conclusion that A.W. knew at the time of disposition that sex offender treatment would be part of his rehabilitation program and that his failure to participate in sex offender treatment would result in invocation of his adult sentence. Rather, the record reflects that at no time during disposition did the trial court order such treatment or advise him of the consequences for failing to participate.

**{¶84}** Granted, the juvenile court judge stated during the dispositional hearing that she would bring him back for a review hearing and if he was not doing what he was supposed to, she would "cut the sentence at ODYS and send [A.W.] to prison." (October 12, 2016 tr. 17-18). However, I find this statement insufficient to apprise A.W. of the consequences of failing to participate in sex offender treatment, considering the juvenile court's subsequent statement:

> [a]nd if you're still doing everything *you can* by May 23, 2017, you *will have completed* the terms of Juvenile Court, the SYO, the serious youth offender sentence, will go away and you can then go on and live your life.

(*Id*. at tr. 18.)

**{¶85}** It must be remembered that when A.W. entered his admission to the amended delinquency complaint, the juvenile court was clear with A.W. that the only conduct that would lead to the invocation of his adult sentence were further delinquent acts. Specifically, A.W. was on notice that his adult sentence would be invoked only if he acted up at ODYS, .

**{¶86}** Subsequently at the disposition hearing, the court vaguely advised A.W. that he could be sent to prison if he "mess[es] up at ODYS at any given time," and "if, in fact, you are not doing what you're supposed to." (October 12, 2016 tr. 15, 17.) And while the juvenile court indicated at disposition that it wanted sex offender treatment put in place at ODYS, it never advised A.W. or issued an order that his failure to participate in treatment would warrant invocation of his adult sentence.

**{¶87}** Constitutional due process requires that A.W. have specific notice of the conduct that could lead to the invocation of his adult sentence. When, as here, he was told that his adult sentence would only be invoked by his engaging in delinquent acts, his due process rights were violated when his adult sentence was invoked for some other condition — failing to sufficiently participate or engage in sex offender treatment.

### 3. No Chance to Satisfy — Factual Impossibility

{¶88} The majority summarily disposes of A.W.'s argument that his due process rights were violated when the juvenile court invoked his adult sentence based upon his failure to complete sex offender treatment despite the factual impossibility of him completing such treatment given the short duration of his ODYS commitment. The majority concludes that the court never conditioned the adult portion of his sentence on the *completion* of "the entire sex offender program," because the court only stated at the dispositional hearing that it wanted sex offender treatment put in place at ODYS and for A.W. "to have a better understanding of what's appropriate and what's not." I agree that this was the juvenile court's statement and initial position. However, the record demonstrates that this condition drastically changed following his commitment to ODYS when the court on January 20, 2017, subsequently ordered A.W. to fully participate in sex offender treatment, and stated that failure to do so would result in the invocation of the adult portion of his sentence. Moreover, the juvenile court only required A.W. to participate in treatment, which he did, although apparently not to the satisfaction of ODYS and the juvenile court.

{¶89} The majority's statement that if A.W. had "taken responsibility for his actions and taken his sex offender treatment seriously when he entered ODYS, he could have avoided the adult sentence even if he did not complete the entire sex offender program" is mere speculation on what the juvenile court would have done considering at all relevant times the individuals at ODYS felt prison was the better option for A.W. Morever, I fail to understand the majority's conclusion that the juvenile court's statement made at the January 2017 review hearing that "he's doing well" equates that A.W. was "making progress" toward "what's appropriate" when he had yet to start sex offender treatment.

{¶90} The evidence in the record is clear that A.W. was unfairly punished for a factual impossibility. It must be noted that even though A.W. entered ODYS in November 2016, he

was not assessed for his treatment needs until December 2016. At that point, he only had approximately six months remaining on his ODYS commitment to fully participate in a nine-month sex offender program.

{¶91} Both A.W.'s treating psychologist and supervising psychologist at ODYS were clear that given the abbreviated duration of A.W.'s ODYS commitment, it would have been impossible for A.W. to complete the sex offender treatment programming. Dr. Alpert testified that "[e]ven if [A.W.] would have engaged in sex offender treatment on his first day in ODYS, that would not be enough time," because treatment is at least nine months and A.W., given his "vast amount of issues," may have required even more time. Dr. Greene likewise testified that even if A.W. had begun his sex offender treatment at the beginning of his ODYS commitment, he "could potentially be, you know, 60 to 70% done though it's very variable." (May 22, 2017 tr. 9.)

{¶92} This factual impossibility was exacerbated by the unreasonable delay in A.W.'s treatment caused by ODYS. At no time during the January 18, 2017 hearing when the court ordered sex offender treatment, did anyone indicate to the court that treatment would be delayed due to the scheduling procedures and treatment preferences of ODYS, or that A.W. would not even satisfactorily "scratch the surface" of the treatment before his 21st birthday.

{¶93} Moreover, despite the juvenile court's order that AW either participate in sex offender treatment or go to prison, ODYS did not make treatment available to A.W. for over 70 days even though A.W. agreed to participate. Furthermore, the record reflects that no one from ODYS advised the court prior to the March 31, 2017 hearing that treatment was not made available to A.W. At that hearing, Dr. Alpert admitted to A.W.'s willingness:

> Okay. When he came back [from being in court in January], his social worker let me know that he wanted to meet with me again. So I did meet with him at the

very beginning of February.   At that time he was very forthcoming about his sex offending.

(March 31, 2017 tr. 5.)

{¶94} The Court was bewildered to learn about the delay in treatment, stating:

So how — I don't understand — even though you have a closed group and I understand that, how did we not go to Plan B and figure out how to get him the required sex offender treatment?   It's been two months now where I ordered him to do something.   He agreed to do it and we're the ones that are failing him?

(March 31, 2017 tr. 6.)   I agree with the juvenile court that the system was failing A.W.   The record is clear that the juvenile court acknowledged during the March 31, 2017 hearing that the delay in implementing sex offender treatment from January to April was the fault of the scheduling procedures at ODYS, and placed the blame squarely upon the institution.   The juvenile court was very troubled and actually asked for guidance about when she brought A.W. back in April, "are we going to say that he has fulfilled the requirement that this Court set forth for his treatment?"   (*Id*. at tr. 8).   In my belief, the only person looking out for A.W. was the juvenile court.   It was the court that was finding solutions to the situation and making suggestions, whereas the institution was placing blame on A.W., upset that they had to make special arrangements for him and reminding him that he was "not special."   (*Id*., tr. at 9, 15.)

{¶95} Thereupon, the juvenile court made, what I perceive to be, a promise to A.W.:

THE COURT:   All right.   So what we're going to do is you're going to start and April 5th you're going to do the sex offender treatment.   We're going to accelerate it by doing an individual group program along with it.   And then what I'm going to do is — when do you turn 21, May 23rd? * * * So we're going to push your April 21st [review hearing] into May *and if you do everything you're supposed to, I will not impose your SYO*.   Okay?   Do we got a deal?

A.W.: Yes, your honor.

(Emphasis added.)   (*Id*., tr. 10.)

**{¶96}** Following the review hearing, the court issued another journal entry:

> Although the youth was committed for a sex offense, [A.W.] was refusing in December 2016 to take responsibility for his actions nor participate in sex offender treatment. In February, the youth expressed that he would like to participate in Sex Offender Treatment, although he was told that the next class was not until April 5, 2017 and would take approximately nine months. The youth turns twenty-one on May 23, 2017 and needs to complete as much of the program as he can. [ODYS] agreed to give him an additional individualized program to accelerate the youth's progress.
> IT IS THEREFORE ORDERED that the youth shall participate and engage in individualized sex offender treatment. [ODYS] shall ensure that individualized services are offered to the youth.
>
> IT IS FURTHER ORDERED that the youth shall fully cooperate, including but not limited to engaging in services in the evenings and weekends. Failure to engage with services may result in the Serious Youth Offender disposition being invoked.

(Apr. 3, 2017 Journal Entry).

**{¶97}** I am not turning a blind eye to the fact that A.W. could have started treatment following his assessment in December, but on January 18, 2017, when everyone was in agreement that counseling was mandatory and failure to do so unequivocally warranted the imposition of his adult portion of his sentence, no programs, treatment sessions, or counseling services were made available to A.W. until after March 31, 2017. This was over 72 days — for 72 days the system failed A.W.

**{¶98}** In addition to not providing adequate notice of the existence of court-ordered sex offender treatment and consequences, the proceedings in this case do not "measure up to the essentials of due process and fair treatment" because it was impossible to meet the court's unstated expectation that A.W. complete sex offender treatment at ODYS to everyone's satisfaction. The conditions and consequences kept changing, causing the invocation of A.W.'s adult sentence to be based on a flawed and fundamentally unfair premise, which violates the very fabric of the Due Process Clause.

**{¶99}** Accordingly, I would find that A.W. was deprived due process of law when the juvenile court invoked the adult portion of his sentence.

### E. No Evidence of Misconduct — Fifth Amendment Violation

**{¶100}** Furthermore, once it was discovered that it was impossible to complete sex offender treatment to the state's satisfaction, and A.W. had not engaged in the requisite misconduct to warrant invocation of his adult sentence, A.W.'s incriminating statements made during treatment were used against him to justify the invocation of the serious youth offender specification under the guise that he creates a substantial risk to the safety or security of the community.

**{¶101}** I agree with the majority's analysis and conclusion that A.W.'s Fifth Amendment privilege against self-incrimination was violated when the juvenile court relied on statements A.W. made to his therapists during sex offender treatment to justify the imposition of the adult portion of his sentence. I further agree that the remedy for this violation is suppression of the tainted evidence, and that A.W.'s incriminating statements could not be used as a basis for invoking the adult sentence.

**{¶102}** However, I disagree with the majority's conclusion that even absent these statements, the weight of the evidence supports the juvenile court's decision to invoke A.W.'s adult sentence. The majority concludes that failure to actively participate in sex offender treatment constitutes misconduct under R.C. 2152.14(E)(1)(c) if the failure to participate results in inadequate rehabilitation. In some cases this may be true, but as it pertains to the facts presented in this case, I disagree.

**{¶103}** A juvenile court may invoke the adult portion of a person's serious youthful offender sentence if it finds by clear and convincing evidence that "the person engaged in the conduct or acts charged under division (A), (B), or (C) of [R.C. 2152.14], *and* the person's

conduct demonstrates that the person is unlikely to be rehabilitated during the remaining period of juvenile detention."  (Emphasis added.)  R.C. 2152.14(A)(1)(c).

{¶104} "The conduct that can result in the enforcement of an adult sentence includes committing, while in custody or on parole, an act that is a violation of the rules of the institution or the conditions of supervision and that could be charged as any felony or as a first-degree misdemeanor offense of violence if committed by an adult, R.C. 2152.14(A)(2)(a) and (B)(1), or engaging in conduct that creates a substantial risk to the safety and security of the institution, the community, or the victim.  RC. 2152.14(A)(2)(b) and (B)(2)."  *D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, at ¶ 36.

{¶105} There is no dispute that A.W. did not commit an act that could be charged as a felony or first-degree misdemeanor.  The issue is whether the failure to sufficiently complete sex offender treatment satisfies the requirement of "engaging in conduct that creates a substantial risk to the safety and security of the institution, the community, or the victim."

{¶106} In support of its conclusion, the majority cites to the Ninth District's recent decision in *In re D.J.*, 9th Dist. Summit Nos. 28472 and 28473, 2018-Ohio-569.[3]

{¶107} D.J., age 15, was committed to ODYS following an adjudication for rape and felony murder.  He appealed his adjudication, but after doing well during his commitment, he dismissed his appeal.  Following the dismissal, the juvenile court noted that D.J.'s sex offender treatment would begin, but D.J. refused to enter the program until nine months before turning 21 years of age.  Although he attended and participated in the first phase of the program, he did not meet his goals because he would not identify the triggers for his conduct.  This prevented him from continuing with the second phase of his treatment.

---

[3]  On April 2, 2018, D.J. appealed this decision to the Ohio Supreme Court.  *See In re D.J.*, 2018-0479. The jurisdictional memorandum is pending.

{¶108} Less than two months before D.J.'s 21st birthday, the state moved to invoke the adult portion of his sentence. Following a hearing, the juvenile court granted the motion, finding that by failing to complete sex offender treatment, D.J. engaged in conduct that posed a substantial risk to the safety of the community, and that he could not be rehabilitated before turning 21.

{¶109} The Ninth District affirmed the juvenile court's decision. It concluded that D.J. had 29 months to complete sex offender treatment, which typically takes between 9 and 18 months. And by intentionally waiting until he had only 9 months prior to turning 21 to begin treatment, it was too late to finish the treatment in light of his minimal participation and emotional detachment from his offense. The court concluded that D.J., in failing to complete sex offender treatment, engaged in conduct that created a substantial risk to the safety of the community.

{¶110} The facts and circumstances in *D.J.* are distinguishable. The most glaring distinction is that D.J. had over 29 months to complete sex offender treatment. His commitment to ODYS did not create an impossibility, unlike A.W.'s six-month commitment. Additionally, the facts in *D.J.* indicate that the juvenile court ordered sex offender treatment during the disposition hearing. In this case, the juvenile court did not order A.W. to participate and engage in sex offender treatment during disposition. D.J. also refused to participate in treatment from the beginning of his commitment up until nine months before his 21st birthday — he refused for almost two years. Whereas in this case and contrary to the majority's statement, A.W. did not refuse to participate in sex offender treatment once he was ordered to participate and advised that failure to do so would result in the invocation of his adult sentence.

{¶111} Finally, the facts in *D.J.* indicate that D.J. obtained no benefit from the sex offender treatment that he did receive, whereas the facts here show that A.W. responded well to

individualized treatment, and despite only completing seven of the 35 lessons in the first phase of the program, A.W. was benefitting. Dr. Greene, his individual therapist, testified that A.W. was very engaged and did the work. Bonita Reaves, the social worker who facilitated the group therapy, testified that A.W. did well in group, was always on time, did a lot of sharing, asked relevant questions, and completed all of his homework assignments.

{¶112} In addition to his therapists testifying that A.W. was engaged in treatment, A.W.'s social worker, Dorothy Chapman, advised the court that A.W. participated and completed his substance abuse group, completed aftercare group, and participated in his education requirement. She stated, "[H]e reports his goals for the next 30 days as completing or participating in SO program as required, completing Phase 2 of the substance abuse and completing successfully and continue to attend the [inaudible] support group that we have in place." (May 8, 2017 tr. 7.).

{¶113} Accordingly, I find *D.J.* distinguishable from the facts in this case. Moreover, I doubt that failure to adequately engage in treatment and achieve certain desired results is the type of misconduct that the General Assembly intended when it drafted R.C. 2152.14(E)(1)(c).

{¶114} The juvenile court rescinded its promise about not invoking the adult portion of A.W.'s sentence only after A.W.'s incriminating statements made during treatment were relayed to the court. I agree with A.W. that the juvenile court must have relied on his incriminating statements when it imposed his adult sentence because (1) A.W. did not engage in any further wrongdoing or bad acts at ODYS, such as fighting or causing disruption, and (2) the other admissible and untainted evidence establishes that A.W. was doing the best he could in the time he had, which was complying with the exact order the juvenile court issued at the March 31, 2017 hearing.

{¶115} The majority notes that Dr. Alpert testified that A.W. was only "superficially engaged" in group treatment. The rationale for this conclusion, however, was based on A.W.'s

incriminating statements — statements that should have been suppressed. Additionally, the majority relies on Dr. Palmer's statement that A.W. only attended the classes because he wanted to avoid prison, not to reform his behavior. However, as the Ohio Supreme Court has noted, "the threat of the imposition of an adult sentence encourages a juvenile's cooperation in his own rehabilitation, functioning as both carrot and stick." *D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, at ¶ 18. Accordingly, it is not surprising that A.W.'s motivation in cooperating with his own rehabilitation would be to avoid an adult sentence.

## F. Conclusion

{¶116} In my opinion, the record is very clear. A.W. was sentenced to ODYS for approximately 6 months before turning 21 years old. Five months before turning 21, he was ordered for the first time by the juvenile court to participate and engage in sex offender treatment or his adult portion of his sentence would be imposed. Despite this order, ODYS sat on its hands until March 31, 2017, when the juvenile court discovered ODYS had not immediately placed A.W. into sex offender treatment or notified the court of its inability to place him into treatment. A.W. was advised on March 31, 2017, that if he participated in sex offender treatment, the adult portion of his sentence would not be invoked. The court's journal entry noted that A.W. would turn 21 on May 23, 2017, and that he needed "to complete as much of the program as he can." And the court promised A.W. that "if you do everything you're supposed to, I will not impose your SYO." (March 31, 2017 tr. 10.) The record reflects that A.W. did everything he was supposed to do from March 31, 2017, yet the juvenile court still invoked the SYO. It can only be deduced from the record that its justification for doing so was because of statements made during A.W.'s full participation in treatment — incriminating statements that

violated his Fifth Amendment right. The system obviously failed A.W. by depriving him of basic fundamental fairness.

{¶117} For the foregoing reasons, I would vacate the juvenile court's order invoking the adult portion of A.W.'s SYO sentence.